First National Bank *v.* Hartford Life & Annuity Ins. Co.

as evidence against the validity of the will. Mr. Hayden, the only person who knows all about the origin of this will, could have stated all the circumstances to the jury. The reason, if any existed, why the relatives were not notified, and why they were practically disinherited, could have been shown. If the testator, by reason of being a communicant of Grace Church, or for other cause, had manifested an interest in its welfare, and his course of life had been such as to lead to a reasonable expectation that it would receive a large portion of his estate, that could have been shown.

The motion fails to disclose any explanation of these circumstances. If none was in fact given, that of itself adds materially to their weight. If under these circumstances the jury had pronounced against the will, the evidence would have sustained the verdict. We think therefore that the appellants were entitled to the instruction asked for, that undue influence might be proved by circumstantial evidence. That not having been given they are entitled to a new trial.

In this opinion PARK, C. J., and GRANGER, J., concurred; PARDEE and HOVEY, Js., dissented.

[NOTE.—Judge HOVEY sat in this case in the place of Judge LOOMIS who was absent.]

## FIRST NATIONAL BANK OF HARTFORD *vs.* THE HARTFORD LIFE AND ANNUITY INSURANCE COMPANY AND OTHERS.

The act (Gen. Statutes, tit. 17, ch. 1, sec. 9,) provides that shares of stock may be pledged by delivering a power of attorney for their transfer, with the certificate of the stock, to the pledgee; but that no such pledge, without an actual transfer of the stock, shall be effectual against any person but the pledger and his executors and administrators, until a copy of the power of attorney shall have been filed with the treasurer or secretary of such corporation. Another act, passed in 1875, (Gen. Statutes, tit. 17, ch. 1, sec. 8,) provides that corporations "shall at all times have a lien upon all the stock owned by any person therein, for all debts due to them from such person." Held—that the latter act, immediately on its going into effect, created a lien

in favor of a corporation for an old indebtedness, upon stock which had previously been pledged to a third person, such pledge being merely by delivery of the certificate of the stock and a power of attorney for its transfer, with no copy of the power of attorney filed with, or other notice to, the corporation.

A further pledge of the stock was made in the same manner after the act of 1875 was passed, the certificate then delivered being one issued by the company after the passage of that act, and containing no notice of any right of lien on the part of the corporation. Held that the corporation was still entitled to its lien upon the stock as against the pledgee.

Commissioners on an insolvent estate are a special statutory tribunal, created for the sole purpose of determining what claims are entitled to payment from the estate; and their action does not constitute a judgment that can be used for any other purpose.

*G* had pledged to the plaintiffs, as security for a loan of money, certain stock of the defendants, a corporation of which he was a member, by a mere delivery of the certificate of the stock and a power of attorney for its transfer. He was also indebted to the defendants. *G* died insolvent. Both creditors presented their claims to the commissioners on his estate, and they, considering the plaintiffs as having a valid pledge of the stock, deducted its value from the amount of their claim and allowed only the balance; at the same time allowing the defendants' claim with no deduction on account of the stock. Neither party appealed from the report of the commissioners. Held—

1. That there was nothing in the action of the commissioners that estopped the defendants, in a suit in which the plaintiffs claimed to be the owners of the stock, from asserting their right to a lien upon the stock under the statute.

2. That equity required that, if the defendants were allowed to keep the stock, they should pay the plaintiffs the amount by which the plaintiffs' dividend had been reduced and their own to the same extent increased, by the action of the commissioners in deducting the value of the stock from the plaintiffs' claim and not from their own.

A waiver is an intentional relinquishment of a known right. The existence of such an intent is a matter of fact, that should be found by the court below and not left to be inferred by this court.

AMICABLE SUBMISSION to the Superior Court in Hartford County upon the following agreed statement of facts; the parties to the submission being the First National Bank of Hartford, the Hartford Life & Annuity Insurance Company, and Niles P. Hough and Henry A. Whitman, executors of Wareham Griswold, late of Hartford, deceased.

Wareham Griswold, at the time of his death, on the 13th day of January, 1876, was the owner of one thousand and forty-one shares of the capital stock of the Hartford Life & Annuity Insurance Company, which shares were of the par value of $100 each, and which shares stood in his name on the books of the company at the time of his death. Down to

the time of his death he was supposed to be a man of large means.

In the year 1872, Griswold was indebted to the First National Bank of Hartford in about the sum of $40,000 for loans theretofore made by the bank to him. As collateral security for these notes Griswold at that time delivered to the bank a certificate for one hundred shares of the capital stock of the Hartford Life & Annuity Insurance Company, the certificate being numbered 374, with a power of attorney to the bank to transfer the shares to the bank; also a certificate for one hundred and fifty shares of the same stock, numbered 423, with a like power of attorney; and also delivered to the bank as collateral security for the loan certain notes belonging to him, and secured by mortgage, to the amount of about $40,000.

The paper so held by the bank remained unpaid till about the 24th of December, 1875, when the bank took new notes for the $40,000, and surrendered to Griswold the power of attorney to transfer the certificate No. 374 for one hundred shares, and Griswold gave to the bank a new power of attorney to transfer the same shares.

About the same time the bank made Griswold a new and additional loan for $5,500, taking his note therefor.

Afterwards, on the 10th of January, 1876, the bank, at the request of Griswold, delivered to him all the mortgage notes, amounting to about $30,000, and also surrendered to him the power of attorney authorizing the bank to transfer to itself the second certificate, numbered 423, for one hundred and fifty shares of the stock of the insurance company, and thereupon Griswold executed and delivered to the bank a new power of attorney to transfer the same stock to the bank.

On the same day, the 10th of January, 1876, Griswold delivered to the bank another certificate of stock in the Hartford Life & Annuity Insurance Company for two hundred and ninety-six shares, as collateral security for the notes, with a power of attorney to transfer the same.

The bank did not actually transfer any of this stock to itself during the life-time of Griswold, nor did it give any

notice to the Hartford Life & Annuity Insurance Company, that the bank claimed any lien on the stock, excepting so far as the knowledge of Griswold, who was president of the insurance company, constituted such notice, or furnish to the insurance company any copy of either of the powers of attorney, and the insurance company had no knowledge of the same during the life-time of Griswold, excepting so far as the company was chargeable with the knowledge of Griswold.

On the 31st of December, 1875, the Hartford Life & Annuity Insurance Company made a temporary loan to Griswold for the sum of $1,981.90, taking his memorandum check therefor.

On the 12th of January, 1876, it was agreed between the insurance company and Griswold that the company would loan him $10,000, receiving as collateral twenty-two shares of Providence Screw Company stock. Griswold informed the company that his certificates were in Providence, Rhode Island, that he had ordered them to be forwarded at once to Hartford, and that he would transfer them on their arrival, and as an accommodation, in the meantime, desired the company to advance him $8,500 till the arrival of the certificates, when these temporary loans would be taken up. The company, at his request, did on that day advance the $8,500, and received therefor his memorandum check for $5,000, and also two overdue notes signed by E. G. Hastings and guaranteed by Griswold, amounting to $3,500. These temporary advances were made by the company under the belief that Griswold was possessed of a large estate, and was abundantly responsible; and this belief was induced, in part, by the fact that he appeared to be the owner of so large an amount of the stock of the company unincumbered.

Griswold died suddenly on the night of the 13th of January, 1876, and his estate is badly insolvent. He left a will, of which there are two executors, Niles P. Hough and Henry A. Whitman, who are parties to the present suit.

The certificates of the Providence Screw Company stock did not arrive in Hartford till after Griswold's death. After they were received by his executors, which was a few days

after Griswold's death, Whitman, one of the executors, requested the bank to release one hundred and forty-nine shares of the stock of the insurance company, claiming that the same was held by Griswold in trust for others, and offered to transfer to the bank in lieu thereof the twenty-two shares of the Providence Screw Co. stock. To this the bank assented, and delivered to Whitman a certificate for two hundred and ninety-six shares, with an accompanying power of attorney for their transfer to the bank. Whitman, as executor, then transferred one hundred and forty-nine shares on the books of the insurance company, and the insurance company issued a new certificate to the estate of Griswold for one hundred and forty-seven shares, which certificate Whitman delivered to the bank, with a power of attorney for its transfer, and also transferred to the bank the twenty-two shares of Providence Screw Co. stock.

On the 17th of January, 1876, the bank filed with the insurance company copies of all the powers of attorney, and sought to transfer all the shares in compliance therewith.

Griswold, at the time of his death, was the owner of one hundred shares of stock of the First National Bank, represented by two certificates of fifty shares each, one numbered 756, dated December 20th, 1871, and one numbered 772, dated April 5th, 1872, and on the 20th day of January, 1876, Whitman, as executor, exhibited to the bank an envelope containing these two certificates, on which was a memorandum in Griswold's handwriting, as follows: "This 100 shares of First National Bank stock is the property of Griswold, Whitman & Welch;" and informed the bank that it was his duty to transfer the same to Whitman & Welch, surviving partners, and that the judge of probate had directed him so to do. The bank allowed the transfer upon surrender of the certificates, which transfer was made by Whitman as executor.

The bank has demanded from the insurance company a right to transfer the stocks on the books of the company to the bank under the powers of attorney, which the company refused to allow. Other creditors of Griswold have protested against the company allowing such transfers to be made.

Whitman, as executor, on the 15th day of January, 1876, transferred to himself, on the books of the insurance company, two hundred shares of the stock of the insurance company, and on the 21st day of January, 1876, also transferred in like manner two hundred and sixty shares of the stock to George M. Ives, and on the 25th day of January, 1876, Whitman in like manner transferred ninety-two shares to himself and ninety-two shares to said Ives, claiming that all the stock so transferred by him was held in trust by Griswold for himself and Ives.

Griswold for a long time before his death was president, and the largest stockholder of the insurance company.

Since his death a dividend of five per cent. has been declared on the stock, but the dividend on the stock so claimed by the bank has not been paid to any one.

Griswold's estate was represented as insolvent, and commissioners were appointed upon it. Both the bank and the insurance company presented its claim in detail to the commissioners. The bank represented the stock of the insurance company, to the amount of three hundred and ninety-seven shares, as held by itself as collateral security for its claim; the insurance company made no representation as to any lien upon the stock in question for the security of its claim. The commissioners allowed, in addition to other claims of the bank not secured, a claim of $50,627.73 as a secured claim, to which they applied the value of the 397 shares of the stock of the insurance company, which they valued at $31,760, and which, with other collaterals of the value of $8,699, they deducted from the amount of the claim, and allowed only the balance, $10,168.73. The commissioners also allowed a claim in favor of the insurance company, to the amount of $46,601.28, with no deduction on account of the lien of the company on the stock standing in Griswold's name. The report of the commissioners was duly made to and accepted by the court of probate, and no appeal was taken from it by either the bank or the insurance company.

Upon these facts the case was reserved by the Superior Court for the advice of this court.

*H. C. Robinson,* for the plaintiffs.

*First.* The delivery of the certificates and powers of attorney bind the estate. The pledge of stocks in that mode is by statute made binding upon the individual and his estate. " Shares of stock in any corporation    *    *    *may be pledged by executing and delivering a power of attorney for its transfer, with the certificate of stock therein mentioned,* to the party to whom the pledge is made; but no such pledge, unless consummated by actual transfer of the stock to the name of such party, shall be effectual to hold such stock against any person *but the pledger and his executors and administrators,* until a copy of said power of attorney shall be filed with the cashier, treasurer, or secretary of said corporation." Of course the executors represent creditors as well as heirs.

*Second.* The insurance company cannot object to the transfer. Their refusal at the time was based upon anxiety for the creditors, and their promised interest in the screw stock. They now claim a lien. To this we reply, that they have had no lien as against us upon these shares; and if they have it has been waived.

1. The insurance company has had no lien upon these shares as against us. Before the revision of 1875 only joint stock corporations had a lien upon the shares of their stockholders. Especial provision was made for enforcing these liens. The revisors by omitting a single word, " such," and placing the present section, (§ 8, p. 279,) in the general provisions applicable to corporations, have given it a new force, which now comes to the court for construction the first time, as we believe. The language of the statute is very broad, and its very breadth will induce a court to criticise it somewhat sharply. If it means that a corporation may issue clean certificates of proprietorship in its capital stock transferable upon its books on surrender of the certificate, (as were the certificates at bar,) with no intimation upon them of the intention of the corporation to claim its lien, and the corporation may assert its lien upon all debts of every kind against all the stockholder's shares, against *bonâ fide* purchasers for value and honest loans, a new danger has been added to pur-

chases of stocks which is not yet appreciated by the public. There can be no safety in purchasing stocks, or lending upon them, until the purchaser or borrower is certified of his safety by a certificate in his own name. Such a state of things is at least new. The corporation issues its certificates to whom it may concern, certifying that the shareholder's proprietor- ship is transferable upon surrender of the certificate by the shareholder or his attorney. The significance of the certifi- cate itself is well urged by Judge Bosworth in favor of pur- chasers in *McCready* v. *Rumsey.* 6 Duer, 582. He says:— "When there is nothing in the terms of a certificate to indi- cate that the stock has not been fully paid for, and an outside purchaser of the certificate has no notice that it has not been paid for, it is difficult to see why he should be affected by a lien created by the articles of association." And the U. States Supreme Court in *Union Bank* v. *Laird*, 2 Wheat., 393, emphasize the fact that the corporation verifies by the oath of its officers the fact that they had no intention to waive, and did not waive, a lien by the issue of an ordinary certificate; as if the fact of issuing the clear certificate pre- sumed a waiver which must be rebutted by oath. We submit that it is more for public interest to construe the statute to apply universally to the stockholders themselves, but to their attorneys or assigns only when the certificate itself apprises them of the corporation's intention to claim a lien. But the statute has no application to our right to transfer two hundred and fifty of these shares. These the bank has held from 1872. They were avouched by the two certificates, No. 374 and No. 423, which have been continuously in the bank's possession, and it has always had a power of attorney to transfer these shares. The powers were changed December 24th, 1875, and January 10th, 1876, but these changes were simply substitutions, and the attorneyship never for a moment ceased. The original transactions were made under the law as it existed in 1872. That law, enacted in 1871, made the pledge as good and "effectual as if the same had been trans- ferred to said party on the books of such corporation." The statute goes on to say that the shares shall be open to attach-

ment by creditors, and shall pass to a trustee in insolvency or an assignee in bankruptcy, until a copy, etc., is filed. The pledge of these shares then was good in 1872 against the corporation by the terms of the statute, and the corporation had no lien then. The revision of 1875 did not affect our rights, for they were expressly protected by the revision itself (p. 551, sec. 2).

2. If the corporation ever had a lien, they have waived it upon these shares. When the bank presented its copies of power of attorney and sought to make transfers on the 17th of January, 1876, which was in a reasonable time after the death, the insurance company waived its lien when it failed to assert it. *Weeks* v. *Goode*, 6 Com. Bench, N. S., 367; *Coite* v. *Winter*, 3 Code Reporter, 142; *Brinley* v. *Adams*, 14 Wend., 201; *Murphy* v. *Lippe*, 35 Jones & Sp., 542. The company also waived its lien by writing a new certificate in the name of the estate for the hundred and forty-seven shares. Also by allowing the executor to transfer four hundred and forty-four shares of Griswold's stock after notice of the title of the bank. Also by failing to present it as a claim upon Griswold's estate in the commissioners' court, and by presenting a list of their securities and omitting any claim of lien upon these shares. The statute provides for just such a state of things, (p. 390, § 13,) and contemplates a presentation of the claim for lien. But if there was no legal obligation upon the insurance company to claim their lien, they still abandoned it, and will be estopped against claiming it after having presented a list of unsecured claims, and another list of secured claims with the shares of stock omitted from their list of securities. They can not take a dividend upon an unsecured balance and afterwards exhaust the whole of their undisclosed security. It would be inequitable and unjust. *Gregory* v. *Benedict*, 39 Conn., 22; *Bailey* v. *Bussing*, 41 id., 74. The company has also waived its lien by consenting to the claim of the bank before the commissioners without opposition or appeal.

*Third.* The finding of the commissioners and the acceptance of their report allowing our lien and acquiescing in the

insurance company's non-presentation of any claim upon these shares, is a judgment conclusive upon all the parties before the probate court,—the estate, the insurance company, and the other creditors. *Olmsted* v. *Bailey*, 35 Conn., 587. A decree of the probate court is of course as conclusive as a decree of the Supreme Court. *Gates* v. *Treat*, 17 Conn., 392. These parties were all in the probate court, and the acceptance of the commissioners' report is a final settlement of the whole matter.

*Fourth.* If the insurance company ever had the lien upon these shares, it was a claim against the estate of Griswold, and by not presenting it within the time limited the company is expressly barred by the statute from making the claim. Gen. Statutes, p. 388, § 5. If a corporation can claim liens upon items of inventoried estate and be justified in not presenting them, no estate could ever be settled.

*A. P. Hyde* and *C. E. Perkins*, for the defendants.

1. The insurance company claim that by virtue of the statute (Gen. Stat., p. 279, sec. 8,) they have a lien on this stock for the indebtedness of Griswold to them, not only for that contracted before the time when the stock is claimed to have been pledged to the bank, but for all contracted after that time and before the insurance company had notice of the pledge. The amount of the debts of Griswold to the insurance company fully appears from the commissioners' report on his estate, by which it appears that his indebtedness to the company, not otherwise secured than by this lien, amounts to $46,601.28. The company claim that, by a fair construction of the 9th section of the statute, no pledge of the stock would be valid, so as to defeat their lien for any advances made by them to Griswold before they were notified of the attempted pledges as required by the act. If we are correct in our construction of these sections of the statute, it is clear that the bank is not entitled, under its pledge, to any transfer of this stock, until it shall have first paid the debt due from Griswold to the insurance company. *Vansands* v. *Middlesex Co. Bank*, 26 Conn., 144; *Stebbins* v. *Phœnix Fire Ins. Co.*, 3 Paige,

350; *McCready* v. *Ramsey*, 6 Duer, 574; *Arnold* v. *Suffolk Bank*, 25 Barb., 424; *Rogers* v. *Huntington Bank*, 12 Serg. & R., 77; *Grant* v. *Mechanics' Bank*, 15 id., 140; *Sewall* v. *Lancaster Bank*, 17 id., 285.

2.  The estate of Griswold being insolvent, this attempted pledge of the stock is void as against the other creditors of Griswold, and will not be enforced by a court. In the first place, the delivery of the certificates of stock with powers of attorney to the bank vested no legal title or interest in the bank.   The stock could only be transferred on the books of the company.   Such a power of attorney might be irrevocable by Griswold during his life, but its execution was terminated by his death, as no act can be done in the name of a dead man.   After his death the pledge, if any existed, could only be enforced in a court of equity.  *Hunt* v. *Rousmanier's Admrs.*, 8 Wheat., 201; *Watson* v. *King*, 4 Camp., 272; *Platt* v. *Hawkins*, 43 Conn., 139.   The claim of the bank to this security being merely an equitable one, a court of equity will not interfere to enforce it, unless the equity of the bank is superior to that of the other creditors.   This can not be claimed in the present case, inasmuch as the neglect of the bank to give notice of the pledge enabled Griswold to hold himself out to the world as the absolute owner of this stock, and thereby contract debts which are now outstanding.   The claim of the bank gains no strength from the statute authorizing a pledge of stock without an actual transfer, as by their own laches they neglected to give the notice required by the statute, and so contributed to the mischief which that requirement sought to avoid.   In the next place, this stock remained liable to attachment by any creditor until the death of Griswold; and it is clear that, if he had made an assignment as an insolvent debtor, his assignee would have held the stock. *Shipman* v. *Ætna Ins. Co.*, 29 Conn., 245.   But the executor of an insolvent estate occupies the same position as such a trustee; that is, he has all the rights of creditors, as well as of the testator.   In fact, in an insolvent estate there are none whose rights are represented except creditors.  *Freeman* v. *Burnham*, 36 Conn., 470, 475; *Andrus* v. *Doolittle*, 11 id.,

289; *Williams* v. *Morehouse,* 9 id., 473. Can it be claimed, if this stock had been attached by a creditor, that, by the death, the attachment would have been dissolved for the benefit of the bank, and not for *all* the creditors whose rights are represented by the executors? Except for the provisions of the statute it would hardly be claimed that the bank could compel the executors to convey the stock to them. But much reliance is placed on the language of the act, which provides that, unless notice is given as required, such transfer shall not be effectual to hold said stock against any person " but the pledger and his executors, &c." The statute, though it speaks of the executors, clearly means to refer to them so far as they represent the debtor and not as they represent creditors. The original act of 1871 shows that the rights of creditors were the very ones intended to be protected by the requirement of notice, and in the present law the change of phraseology adopted by the revisers was intended to convey the same idea.

3. The bank has no better claim to a transfer of the hundred and forty-seven shares, under the power of attorney signed by one of the executors, than they have under those signed by Griswold. The bank surrendered the certificate for two hundred and ninety-six shares to this executor, because a part of the stock represented by that certificate did not belong to Griswold, and to enable the executor to transfer that stock to those for whom it was held in trust; and the executor, taking a new certificate for the remaining hundred and forty-seven shares in the name of the estate, returned the same with his power of attorney to the bank, in order to give them the same rights they had before, and no more. It matters little whether this was done by the executor under wrong advice or under a mistaken idea of his duty. There was no new consideration, and the bank claims to hold it as collateral security for the same debts for which it before claimed to hold it. If an executor of an insolvent estate should, in collusion with one creditor, attempt to convey the assets of the estate to such creditor, and so prefer him, to the injury of the others, a court of equity would restrain the attempt or declare the

transfer void, as the case might require.   At all events, it would not lend its aid in enforcing such a transfer.

PARDEE, J.   This is an amicable submission, upon an agreed statement of facts, to the Superior Court, under the statute, of matters in dispute between the Hartford Life and Annuity Insurance Company, the First National Bank, and the estate of Wareham Griswold, late of Hartford, deceased, represented by his executors; these corporations and persons being all of Hartford.   The Superior Court has asked the advice of this court as to what decree shall be passed in the premises.

[After making a statement of the principal facts in the case, which is omitted, as the facts have been sufficiently stated, the opinion proceeds as follows:]

The statute (Rev. of 1875, page 279, sec. 9,) provides as follows: "Shares of stock in any corporation organized in this state under the laws of this state or of the United States, may be pledged by executing and delivering a power of attorney for their transfer, with the certificate of stock therein mentioned, to the party to whom the pledge is made; but no such pledge, unless consummated by an actual transfer of the stock to the name of such party, shall be effectual to hold such stock against any person but the pledger, and his executors and administrators, until a copy of such power of attorney shall be filed with the cashier, treasurer, or secretary of said corporation."

By virtue of the pledge by Griswold of the stock here in question to the bank and the delivery of the certificates, with powers of attorney for the transfer thereof to themselves, for the security of his indebtedness, they acquired as against him an equitable interest in it, liable however to be defeated by attachment, by levy, by transfer to a trustee in insolvency or to an assignee in bankruptcy, by his death leaving creditors whose debts could only be paid in full by the proceeds thereof, and by a lien placed thereon by a public statute.   The bank had the privilege of changing this possible, contingent equitable interest into a perfected indefeasible lien for the security

of their debt. They suffered it to pass from them by omitting either to transfer the shares upon the books of the insurance company to themselves, or to give notice to that company of their lien, until after the enactment of a statute which went into operation on the first day of January, 1875, and which provides that every corporation "shall at all times have a lien upon all the stock owned by any person therein, for all debts due to it from him." Revision of 1875, page 279, sec. 8. Therefore, the bank not having previously made any transfer or given any notice, on that day there came into existence in behalf of the insurance company a statutory mortgage or pledge of the stock to themselves as security for Griswold's present indebtedness to them; and thereafter, in the absence of any notice from the bank, whenever the company made a loan to him, there simultaneously sprang up a like mortgage for the security thereof; and this without any request upon their part or any agreement upon his. Inasmuch as it is the creation of a public statute, no act upon the part of the insurance company by way of actual notice to any person or corporation was necessary to the perfection of their lien, because the statute requires none, and is itself of course constructive notice to all persons. The legal interest of the company in the shares, thus perfected by the power of a public act, must take precedence of the imperfect, because secret, interest of the bank therein.

After this eighth section went into operation whoever purchased stock in any corporation or took it in pledge as security for loans, could not be sure of his legal title as owner or of his equitable interest as pledgee until he had transferred it to himself upon the books of such corporation, or had filed the statutory notice. That statute took immediate effect upon all corporate shares then existing without regard to the fact that the various corporations had previously issued certificates representing such shares, framed in absolute terms of ownership and containing no notice of any claim for such lien; and it takes like immediate effect upon shares, the certificates for which have been issued since the enactment thereof, without stating therein any claim for such lien; for, the act does not

require corporations to embody any such notice in their respective certificates as a pre-requisite to the lien, and the court has no power to demand it; and as in contemplation of law every person has notice of the privileges conferred and obligations imposed by a public statute, whoever accepts either as purchaser or pledgee of corporate shares must consider the statutory provision for a lien as a constituent part of the certificate which he receives.    And so far as it concerns, the hundred and forty-seven shares which were returned to the bank with the new power of attorney, the pledge for Griswold's indebtedness to the company was by force of the statute constructively embodied in the new certificate representing them, as it had been in the ,ormer one.

By virtue of this ninth section the pledge to the bank was good as against Griswold and his heirs, without transfer of the shares or notice to the insurance company; and if upon his death these shares were not needed for the payment of debts, as against his heirs a court of equity would have enforced the pledge in favor of the bank.

Going beyond this, they urge that the statutory mortgage to the insurance company does not take precedence of the equitable interest acquired by them two years before the passage of the act giving corporations a lien upon their own shares as security for indebtedness to them from the owners thereof. The statute as originally passed in 1871 declared that stock pledged by a delivery of the certificate with a power of attorney to the pledgee should not be "protected from attachment or levy by any creditor of the owner thereof or from passing to his assignee in bankruptcy or trustee in insolvency until a copy of said power of attorney shall be filed with the cashier, treasurer, or secretary of the corporation."    Session Laws of 1871, page 525.    It re-appears in the Revision of 1875, page 279, section 9, declaring that "no such pledge shall be effectual to hold such stock against any person but the pledger and his executors and administrators until," &c.  . The words are changed but the meaning remains.

The pledge by Griswold to the bank was in 1872; after the enactment of the ninth section in 1871 it became impossible

for the bank to acquire any vested interest in the stock as against creditors, present or future, except by a notice. The statute expressly preserves creditors' rights. If Griswold had gone into bankruptcy all debts would have shared equally in the proceeds of the stock. The statute reserved to the insurance company the right to take precedence of the bank by an attachment for the security of their debt, irrespective of the question as to when it was contracted. The bank acquired and held their interest in the stock under a statute which exposed it to all modes of attack from creditors, so long as it rested upon a secret pledge; they took that interest upon a statutory declaration that it should not become vested as against any creditor until they had filed a notice; and the act of 1875 is the exercise by the legislature of power reserved to itself in the act of 1871, and only added to attachment, levy, and assignment to trustees in insolvency, one more door of access to the stock; not a new right, but simply an additional method for enforcing one already in existence. The insurance company, seeing that no one had secured any vested interest in the stock on the first day of January, 1875, by giving the statutory notice, from that day onward had the right to refrain from obtaining other security either by pledge or attachment and to rest solely upon what the statute had done for them; presumably they did so; on that day they could have attached; practically the statute placed an attachment upon the stock in their behalf; it publicly recorded a completed lien for their security, and that would have been the precise effect of an attachment; the equity of the bank reached no farther than the person of Griswold. Conceding that the bank took a power of attorney coupled with such an interest as the lender of money has in securities thus pledged, and conceding the fullest effect otherwise to be claimed for that power in a court of equity, yet our statute declares that it shall not stand before debts present or future unless a notice is filed; and the statute gives no protection except at the price of full compliance with its requirements. There being no notice, the sole security to the bank rested upon Griswold's solvency; virtually, nothing was

added to his name.    The equitable interest of the bank stands postponed to the publicly recorded lien in favor of the insurance company, by the principle which postpones an unperfected to a completed attachment, or a secret unrecorded mortgage of land to one which although later in time is recorded by a grantee who has no notice of the first.

. But if this position is untenable we should be compelled to advise the Superior Court that the stock must go unencumbered into the mass of the estate for the equal benefit of all creditors.    The bank, the insurance company and the executors have signed the articles of submission and are parties of record; all other creditors are parties in the person of the executors; for in the case of an insolvent estate there is no heritable interest; they represent, really, creditors alone. Upon Griswold's death the law laid its hands upon his estate; he dying insolvent the debts then due stood practically, so far forth as the secret interest of the bank is concerned, as if, living, the law had placed his estate in the hands of a trustee in insolvency; their precedence was made by the statute to depend upon a notice; in the absence of that, whenever, living, his estate goes to a trustee in insolvency, or, dying insolvent, it goes to his executor, the statute reduces the bank to the level of unsecured creditors.    To repeat what we have already said, whatever at common law might have been the extent of the right conferred upon the bank as lenders of money upon this manner of pledge, the statute, so far forth as other creditors are concerned, limits it to the duration of Griswold's solvency.

Griswold having died insolvent his executors proceeded in accordance with the statutory provisions concerning insolvent estates; commissioners were appointed by the probate court to receive the claims of creditors, to determine the amount, if anything, due upon each, and to report to that court a list thereof, specifying particularly those which they allowed and those which they disallowed; and if any creditor having any security for his claim upon any property of the estate, should present that claim for allowance, it is made their duty to enquire into, determine, and report the cash value of such security.

First National Bank v. Hartford Life & Annuity Ins. Co.

The bank presented their claim to the commissioners, and added the statement that they had by way of security therefor a lien upon the three hundred and ninety-seven shares of stock in the insurance company; that company presented their claim but were silent as to any lien upon the same stock. The commissioners determined the amount due from the estate to these parties respectively and reported the same to the probate court; reporting likewise the value to the bank of the insurance shares as security for their debt. The court accepted the report; no appeal has been taken from it, and the statutory time for taking an appeal has passed.

The bank now urges that the finding of the commissioners and acceptance of their report by the court is a conclusive judgment upon the estate, the bank, the insurance company, and all other creditors, as parties before that court, not only as to the amount of their respective claims, but as to which has the prior lien upon the insurance shares.

This, we think, is to attribute to the commissioners powers with which they are not vested. They are a statutory tribunal, brought into existence for the single and special purpose of determining and reporting to the probate court how much, if anything, is due to each claimant, and thereby finding the aggregate of debts due from the estate; they cease to exist when this duty is performed. The issue, so far as there can be said to be an issue before a tribunal when there are no pleadings, and in a strict sense no parties, is between the estate on the one hand and the body of creditors on the other; the determination of the commissioners as to what the estate owes upon any claim presented is final, if unappealed from; their determination that a particular debt is due to $A$ and not to $B$ is not conclusive as between them; if the commissioners report that the debt is the property of $A$ and the executor pays to him the percentage due thereon, the estate is protected from any further proceedings on the part of either of them; but if $B$ can thereafter show, either in a court of equity or a court of law having general jurisdiction, that the money received by $A$ was due to himself, the finding of the commissioners will not protect $A$; they are not clothed with power

to make a conclusive adjudication of *B's* right to receive the money. Again, if Griswold had executed his promissory note for $1,000, and *A* had presented it to the commissioners as a claim in his favor, and *B* had likewise presented a claim founded upon the same note, declaring it to be his property and that *A* had unlawfully possessed himself of it, and the commissioners had heard them and had reported to the probate court that the estate owed $900 upon the note to *A*, and no appeal had been taken from the decree accepting the report, and the executors had paid the percentage to *A*, while the decree would afford perfect protection to the executor in making the payment, it would not bar *B* from thereafter proving in a court of general jurisdiction, upon a proper proceeding, that the debt was his property and recovering from *A* the amount received by him. But *B* is concluded as to the amount, and although in his proceeding against *A* he should prove that the estate owed $1,000 upon the note, he can recover no more from *A* than the latter received.

And the issue before the commissioners upon the estate of a living insolvent is confined to the determination of the amount of indebtedness to be paid to each claimant under the trusteeship then existing; if under that *A* presents a claim for $1,000 and the commissioners report only $500 to be due thereon, and he receives his percentage from the trustee upon that sum; and if at some future time the insolvent becomes possessed of property, *A* is not concluded by the report of the commissioners as to the amount of his debt, and if in a proper legal proceeding against the debtor he can prove that the debt amounted to $1,000, he can recover the unpaid portion of that sum. Again, if the bank and the insurance company had each presented to the commissioners the whole of their respective claims against Griswold's estate, together with their several claims to a first lien upon the insurance stock, and had been heard, and the commissioners had decided the amount of the debt due to each, and had reported that the right to the benefit of the security belonged to the bank, and no appeal had been taken from the decree of the probate court affirming this report, as between the bank and the

insurance company the whole question as to which is entitled to the first lien upon the stock is as open as before. The bank and the insurance company were each compelled to present their respective claims to the commissioners if they desired to receive a percentage above the proceeds of such securities as they might respectively hold; the allowance or disallowance of these claims of indebtedness was the issue to be determined; the application of collateral securities was merely incident to the main question; and as an accepted report from commissioners makes conclusive determinations only for the benefit of the estate and for the guidance of the executor or trustee thereof as to the payment of percentages upon proven debts and the valuation and application of pledged property, when the bank presented to this special tribunal of limited jurisdiction an unfounded claim upon the stock as security for their debt, the insurance company could ask the same tribunal to recognize their lien upon the stock, without conferring upon it the power, not otherwise possessed, of finally concluding them, as between themselves and the bank, upon that matter. Nothing is conclusively decided beyond what is necessary to effect the sole purpose of the proceeding, that is, the final settlement of the estate of a deceased insolvent, so far as the estate itself is concerned. To accomplish that it is only necessary to know the amount of its indebtedness and to certify to the executor the names of persons or corporations to whom he can safely pay percentages upon the debts allowed; it is not at all necessary to that end that it should be conclusively determined as between the bank and the insurance company that one or the other had the superior claim to the security; for the estate has not the slightest interest in that question; it owes to each more than the value of it; it cannot be helped or harmed by any result which may be reached concerning it; it owes no more, no less, either to the bank or to the insurance company; and the report made by this special tribunal should not conclusively adjudicate a matter which is neither necessary nor pertinent to the issue before it.

If we turn to the statutes creating commissioners we find

that it is their duty "to receive and decide upon the claims of creditors of such estate;" to "report to the court a list of the claims exhibited to them, specifying particularly those allowed and those disallowed;" and if any creditor has security for his claim they are to "enquire into the cash value of such security;" these are the terms of the limited commission issued to them by the legislature.

We are reminded that the decree of a court of probate in a matter within its jurisdiction is as conclusive upon the parties as the judgment or decree of any other court; but, as the determination of the commissioners is only conclusive as to the amount of a debt and as to the person to whom the executor can safely pay a percentage thereon, and this for the benefit of the estate, the passage of the decree by the court only confirms the conclusiveness to the same extent and for the same purpose.

In *Loomis* v. *Eaton,* 32 Conn., 550, land was mortgaged, first, to secure a note for $2,000 to *A;* second, to secure a debt to *B;* the mortgagor died and his estate was represented insolvent; the first mortgagee presented his claim for principal and interest to the commissioners; the administrator and the second mortgagee appeared and objected to the allowance of any interest on the ground of usury, and the commissioners allowed only the principal, rejecting the claim for interest. Subsequently, upon a proceeding for a foreclosure, the first mortgagee found entrance to a court of general jurisdiction, and it was held that the judgment of the commissioners was not conclusive upon him in that court upon the question of usury, and that he was entitled to interest; and he was allowed to take a decree of foreclosure for unpaid interest. The court says: "The fact that the respondent was present and assisted the administrator in making a defence can make no difference. He was not a party to that proceeding; and the allowance or disallowance of a claim by the commissioners could only affect the property in the hands of the administrator." And this view of the law is further illustrated and enforced in a discriminating note by the reporter.

And if, under certain circumstances, the finding of the

commissioners is not absolutely final and conclusive even as to the amount of a debt and as against the creditor who presents it, much less should their determination be always and everywhere conclusive upon the collateral and incidental question as to who has the best claim to a given security.

A few days after the death of Griswold, upon the request of H. A. Whitman, one of the executors, the bank delivered to him the certificate for two hundred and ninety-six shares of the insurance stock, and consented that he should transfer one hundred and forty-nine shares thereof to certain persons for whom Griswold had held the same in trust; the insurance company permitted him to make the transfer upon their books, and issued a new certificate for the remaining hundred and forty-seven shares in the name of the estate of Griswold, which certificate Whitman delivered to the bank with his power of attorney as executor to transfer to themselves; and he also transferred twenty-two shares of Providence screw stock to them. The insurance company also permitted Whitman as executor to make several transfers of shares of their stock which stood in Griswold's name and were not pledged to the bank, upon Whitman's declaration that Griswold was not the owner thereof, but held them only in trust. On the 17th day of January, 1876, the bank delivered to the insurance company copies of all the powers of attorney, and asked leave to transfer the shares to themselves in pursuance thereof; the company refused to permit the bank to make the transfer, but remained silent concerning any claim to a lien thereon in their own behalf.

The bank insists that the insurance company, by their failure to assert their claim of lien when they refused permission to the bank to transfer the shares, when the executor made transfers, when they issued new certificates in the name of the estate for a part thereof, and when they presented their debt to the commissioners with a list of securities therefor, omitting any mention of their claim of lien upon these shares, by neglecting to oppose before the commissioners the claim made by the bank to a lien upon them and by neglecting to take an appeal from their action in reporting the value of the

shares as a security applicable to the debt of the bank, have waived in favor of the bank all right to the lien now asserted by them.

A waiver is the intentional relinquishment of a known right.    Intent is an operation of the mind and is to be proven and found as a fact, rarely or never to be inferred as a matter of law.    The finding being silent as to the existence of such intent, it is not within the power of this court to find it as an additional fact and impute it to the insurance company.

Upon these principles, the executors will be protected in making the application of the ascertained value of the stock upon the debt of the bank, and in paying to them the general percentage upon the remainder; and in paying to the insurance company the percentage upon their entire debt.    But, inasmuch as by our determination of the question submitted to us, as between these parties the insurance company are found to have the first lien upon the stock and are entitled to have the value thereof applied upon their debt and to receive a percentage upon the remainder only, the executors should transfer the three hundred and ninety-seven shares of the stock to the insurance company, and the latter should pay over to the bank the percentage paid to them by the executors upon the sum of $31,760, that being the value of the stock as ascertained by the commissioners.

We advise the Superior Court that the Hartford Life and Annuity Insurance Company has the first lien upon the stock in question.

In this opinion the other judges concurred; except Loomis, J., who did not sit.