## HOTCHKISS & UPSON CO. v. UNION NAT. BANK.

### (Circuit Court of Appeals, Sixth Circuit. May 20, 1895.)

### No. 229.

1. CORPORATIONS—TRANSFERS OF STOCK—NOTICE—CONNECTICUT STATUTE.

The statutes of Connecticut provide (Gen. St. § 1924) that no pledge of stock of a corporation organized under the laws of that state shall be effectual except as against the pledgor or his executors or administrators, unless it is consummated by an actual transfer of the stock, or a copy of the power of attorney to transfer is filed with the officers of the corporation. *Held*, that the purpose of this statute is to protect persons dealing upon the faith of the apparent ownership of the stock in ignorance of the pledge, and accordingly actual notice thereof is equivalent to a transfer on the books, or the filing of the power of attorney.

2. SAME.

H. and U. were respectively president and treasurer of the H. & U. Co., of which they also owned the greater part of the stock. H. borrowed money from a bank upon pledge of his stock in the H. & U. Co. as collateral. H. embezzled the funds of the company. U., while visiting the bank, before H.'s embezzlement commenced, for the purpose of obtaining discount of notes indorsed by the H. & U. Co., was informed by the cashier of the advances to H., and his pledge of the stock as collateral. *Held*, that the H. & U. Co. had actual notice of the pledge of H.'s stock.

3. SAME—LIEN ON STOCK—DEBT INCURRED BY EMBEZZLEMENT.

Whether the provision of the Connecticut statutes (Gen. St. § 1923), giving to corporations a lien upon their stock for all debts due them by the stockholders, applies, as against a pledgee of the stock by unrecorded transfer, to a debt incurred by the stockholder's embezzlement of the funds of the corporation,—quaere.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

This is a suit in equity, brought by the appellee, the Union National Bank, of Cleveland, Ohio, against the appellant, the Hotchkiss & Upson Company, a corporation organized under the laws of Connecticut. The object of the bill is to enforce a lien upon 260 shares of stock of the defendant below, acquired by it in pledge upon certain transactions with Charles A. Hotchkiss, president of that company. Those transactions were as follows: On November 13, 1885, Hotchkiss borrowed of the complainant $5,000, for which he gave his note of that date. On December 12, 1885, he borrowed $10,000 more, for which he likewise gave his note. On March 16, 1886, he took up these two notes, and gave a new note of that date for the sum of $15,000, that being the amount of both the former notes. This last-mentioned note was renewed from time to time until July 28, 1887, when the note for $15,000 now held by the bank was executed, and was made payable four months after its date. This is one of the obligations constituting the basis of the complainant's ground for relief. On April 16, 1887, the said Hotchkiss made another loan of the bank, this loan being of $6,000, for which he gave to the bank his note of that date. This note was renewed August 19, 1887, by a note for the same sum, made payable in four months. This is the other part of the indebtedness for which the complainant asserts a lien. Upon the making of the original note for

$15,000, Hotchkiss assigned in pledge to the bank for the security thereof two certificates of stock, representing 140 shares of the Hotchkiss & Upson Company, and delivered them to the bank. On making the $6,000 note of April 16, 1887, he likewise assigned in pledge 120 shares of the stock of the same company as security for the payment of that note. Both these assignments of stock consisted of a delivery thereof with a blank power of attorney for the transfer of the stock upon the books of the company, executed by Hotchkiss. Neither of the notes so taken upon the last renewals had been paid, either in whole or in part. The stock has never been transferred upon the books of the company to the bank, and no copy of the power of attorney was ever filed in the office of the company.

The defense is that during the years 1887 and 1888 Hotchkiss became indebted to the Hotchkiss & Upson Company in the sum of $50,000 by reason of his having embezzled the funds of the company of which he had charge as an officer, he being the president thereof. This embezzlement commenced in the early part of 1887, and was continued from time to time through that and the succeeding year. And it is contended that by force of the general laws of Connecticut relating to corporations a lien was given to the company upon the stock standing upon its books in the name of Hotchkiss for the amount of the indebtedness created by his embezzlements, and that this lien is paramount to that of the bank, for the reason that there was no transfer of the stock by Hotchkiss to the bank upon the books of the company, and no copy of the power of attorney, was filed in the office of the company as required by the law of Connecticut in order to make the assignment good as against the company. The provision of the statutes of Connecticut giving the company such lien is found in section 1923 of the General Statutes of that state (Revision of 1887), which reads as follows: "When not otherwise provided in its charter, the stock of every corporation shall be personal property, and be transferred only on its books in such form as the directors shall prescribe; and such corporation shall at all times have a lien upon all the stock owned by any person therein for all debts due to it from him." And section 1924 declares how such stock may be pledged, and the manner in which such pledge may be made effectual, as follows: "Shares of stock in any corporation, organized in this state under the laws of this state or of the United States, may be pledged, by executing and delivering a power of attorney for its transfer, with the certificate of stock therein mentioned, to any party to whom the pledge is made; but no such pledge, unless consummated by an actual transfer of the stock to the name of such party, shall be effectual to hold such stock against any person but the pledger and his executors and administrators, until a copy of said power of attorney shall be filed with the cashier, treasurer or secretary of said corporation." As stated before, the provisions of section 1924 were not complied with; but the complainant in the court below introduced evidence from which, as it alleges, it is made to appear that Hotchkiss, the president, and A. S. Upson, its treasurer, were the owners of nearly all the stock, and were the principal managers of the business of the company; that the business was principally carried on at Cleveland; that the company had extensive dealings with the bank, and that Hotchkiss as president, necessarily, and Upson as treasurer, by distinct information, had notice of the loans by the bank to Hotchkiss, and of the above-mentioned pledges of his stock, prior to the date of the beginning of the embezzlements by Hotchkiss, and that the company was affected by such notice; and it is claimed by the bank that such actual notice is equivalent to the statutory notice required by the laws of Connecticut. The court below found upon the evidence that on April 16, 1887, when Hotchkiss pledged the 120 shares of stock as security for the $6,000 note, he had already embezzled from and was indebted to his company in a sum of more than $14,000, and the complainant's claim upon the shares of stock assigned as security for that sum was rejected; but, it appearing that the pledge of the 140 shares to secure the $15,000 note was made before the commencement of the indebtedness to the company by Hotchkiss, it was held by the court, upon the further finding that the company had notice of the pledging of these shares before the embezzlements commenced, that the bank's lien was superior to that of the appellant. Accordingly a decree was passed denying the lien upon the 120 shares of stock pledged in payment of the $6,000 note, and sustaining

the lien of the bank upon the 140 shares pledged in payment of the $15,000 note. From this decree the Hotchkiss & Upson Company have appealed.

J. E. Ingersoll, for appellant.

Squire, Sanders & Dempsey, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

Having stated the case as above, SEVERENS, District Judge, delivered the opinion of the court.

The appellant contends, in the first place, that there was neither any transfer of the shares of the company upon its books upon the occasion of their being pledged by Hotchkiss to the bank in payment of his loan for $15,000, which is admitted; nor any written notice filed in any proper office of the company of the assignment of the stock, nor any copy of the power of attorney for its transfer, which is also admitted; and that actual notice of such assignment was ineffectual to bind the company. This last contention presents the question to be decided, and it seems to turn upon the construction and effect to be given to the laws of the state of Connecticut. The appellee insists that, while the pledgee of shares of stock in this Connecticut corporation was bound to take notice of the provisions of the charter by which it was organized, yet that, if that stock was transferred in some other state than Connecticut, the transferrer would not be bound by implied notice of the general laws of Connecticut relating to corporations. It is unnecessary, in the view which we take upon another branch of the case, to express an opinion as to whether this contention can be sustained or not. For, assuming that the bank was bound to take notice, not only of the charter, but the general laws of Connecticut affecting the Hotchkiss & Upson Company, we think it was competent for the bank to show that the Connecticut corporation had the notice of the pledge of its stock to the bank for the payment of the $15,000 note, which it was the purpose of section 1924 of the laws of that state, above quoted, to secure. It is a widely prevalent doctrine, applying to a variety of statutes enacted for the purpose of protecting parties dealing bona fide with property upon the assumption of its ownership by the persons dealing with them, against prior liens and conveyances, that, notwithstanding the generality of the language of such statutes declaring that such former liens and conveyances should be held void, if not registered in conformity with the provisions of the statute, as against subsequent purchasers, yet, seeing that the whole object of such provisions was to guard the subsequent purchaser against transfers of which he had no notice, if the object of the statute had been subserved by actual knowledge of the fact, the prior transferee would be protected. And there is no reason why this should not be so. Such laws are not designed to accomplish so unjust a result as that a person having knowledge of another man's equities may defeat them by an act of his own, taken with such knowledge. Converting those statutes to such purpose would be quite contrary to the spirit of their enactment. That such is the general doctrine upon this subject cannot, we think, be disputed. The cases are

too numerous to justify a review of them here. Many of the principal decisions are collected in 1 Jones, Mortg. (5th Ed.) § 538, and the result of them stated; and it is there said:

"The doctrine is the same under statutes which declare without qualification that an unacknowledged or unrecorded deed shall be void as against purchasers, or as against all persons who are not parties to the conveyance."

The rule is the same in respect to personal property. No distinction in the application of the doctrine can be based upon a distinction between the two classes of property. Jones, Chat. Mortg. (4th Ed.) § 308. It rests upon a broad and fundamental equity. It must be conceded that there are occasionally to be found cases which seem to lead to a different conclusion, but the general current and weight of authority is as above indicated. No doubt there are exceptions to this rule where the statute goes further than to provide for the mere giving of notice, and expressly declares that the instrument shall only become valid upon its registration. In such case the condition is made essential to its validity. The decisions of the supreme court of the state of Connecticut show beyond doubt that the rule which prevails in that state upon this subject is the same as the rule which prevails generally in the courts of the several states and of the United States, and it may be regarded as the settled rule of Connecticut that statutes of a kindred character, and having the same purpose as that here under consideration, are to be construed, not as rendering prior transactions void as between the parties themselves or others who had equivalent notice of such transactions, and who, therefore, were in no predicament requiring protection, but as provisions whose whole scope and intended effect was the protection of parties who had an equity arising upon the fact of their having altered their situation, in reliance upon the apparent condition of things. Wheaton v. Dyer, 15 Conn. 307; Blatchley v. Osborn, 33 Conn. 226; Hamilton v. Nutt, 34 Conn. 501. These cases indicate the law of the state, and the rule by which the construction of its statutes should be governed, and are controlling. Bank v. Francklyn, 120 U. S. 747, 7 Sup. Ct. 757; Hammond v. Hastings, 134 U. S. 404, 10 Sup. Ct. 727; Bishop v. Globe Co., 135 Mass. 132. The cases of Platt v. Axle Co., 41 Conn. 255, and First Nat. Bank v. Hartford Life & Annuity Ins. Co., 45 Conn. 22, do not declare any contrary rule as applicable to the provisions of the statute here in question. On the other hand, it is clear from the discussion of the question by the court in the last-cited case that they adopt as the test of decision the principle upon which that court had acted in previous cases turning upon the construction and effect of statutes designed to accomplish in respect of other species of property the same kind of protection against secret incumbrances and conveyances; for the court, in distinctly announcing the rule of their decision, say:

"The equitable interest of the bank [the pledgee] stands postponed to the publicly recorded lien of the insurance company [that is, the lien declared by the statute] by the principle which postpones an imperfect to a completed attachment, or a secret, unrecorded mortgage of land to one which, although later in time, is recorded by a grantee who has no notice of the first."

In neither of the two cases last cited was there any notice to the corporation of the pledge of the shares of its stock, and all that was said by the court in either case has reference to such a condition of things; and the expressions of the court are in harmony with and much like those of the courts generally when discussing the consequences of a failure of the first grantee or mortgagee to record his conveyance where subsequent purchasers in good faith had parted with their property in reliance upon the apparent ability of the grantor to convey or pledge. As to such cases, all that is said in these two Connecticut cases may be fully conceded, but the rule of their decision furnishes quite completely the distinction which shows that the present case is not within the purpose of the statute, and not affected by it, if the claim of the bank that the Hotchkiss & Upson Company had actual notice of the pledge of its stock before the incurring of any liability by Hotchkiss to it is sustained by the proof. It would seem to admit of much doubt whether a debt or liability incurred by positive malfeasance of an officer of the corporation was a debt within the meaning of the statute. The natural inference to be gathered from the language of the statute and the nature of the subject would seem to be that the debts referred to were such as would arise upon an actual contract, for it would be in such cases that the question whether any reliance had been placed by the corporation or any other person upon the state of the records and files in the office of the corporation would arise.

If we are right in supposing that the statute was enacted simply for the purpose of giving notice, it would seem to follow that it had no reference to a case like this, where the liability arises only upon an implied assumpsit founded on a tort. But, passing this question, we proceed to the other branch of the case, and consider the question whether the Hotchkiss & Upson Company had actual knowledge of the pledge of the shares to secure the $15,000 note. That Hotchkiss, the president of the company, had notice, necessarily follows from his having been a participant in the transaction of borrowing the money and pledging the stock. He appears from the evidence to have had, jointly with Upson, the management of the business affairs of his corporation. Whether the knowledge that he had was notice to his company, in view of the fact that in committing the act of embezzlement he was acting in hostility to the interests of the company, may be doubted; yet no such question arises in regard to the knowledge which Upson had of the condition of that stock, which knowledge was acquired prior to the incurring by Hotchkiss of his liability to the company. It appears from the evidence that upon an occasion when Upson, who was the treasurer of the company, was at the bank in October, 1886, for the purpose of discounting notes indorsed by the Hotchkiss & Upson Company, in a conversation between him and Mr. Bourne, the cashier of the bank, the subject of Hotchkiss' dealings with the bank and his pledge of this stock was distinctly brought forward and canvassed with much interest by both of the participants in that interview; and Mr. Bourne testifies that he at that time showed Upson the

book "showing the amount we had loaned Mr. Hotchkiss, and I stated to him the collateral which we held for the loan of $15,000. He took a memorandum of some of the items which I had called his attention to, and thanked me for doing so. Said he would look the matter up, and report to me. He did report to me in a few days, and said that, while some of the notes were not regular Hotchkiss & Upson Company business, the transactions were kept properly upon the books, and that the matter was all right, or would be fixed all right." This indicates also that Upson had knowledge that Hotchkiss had dealings with the bank on his private account, which were mixed up with the company's business. And Upson himself testifies that at one interview, the date of which he could not state, he asked Mr. Bourne "if Hotchkiss had any other liabilities there, and he told me he had some personal loans secured by collateral." He does not essentially contradict Bourne, and his testimony as a whole seems rather to lend confirmation to Bourne's testimony than otherwise; and the testimony of Hotchkiss tends also to show that the fact that this pledge of stock had been made as collateral to the $15,000 note of Hotchkiss was a matter of conversation between Upson and Hotchkiss at the company's office. Upon the whole testimony in reference to the knowledge by Upson at the time when Hotchkiss' defalcation began of the fact that the stock had been pledged, we cannot entertain any doubt whatever, and we quite agree with the court below in holding that the company had notice in fact. Adopting the rule which the counsel for the appellant quotes from 17 Am. & Eng. Enc. Law, 140, tit. "Officers, Private Corporations," that "the notice, to be binding upon the corporation, must be notice to the agent acting within the scope of his agency, and must relate to the business, or, as most of the authorities have it, the very business, in which he is engaged, or is represented as being engaged, by authority of the corporation. It must be the knowledge of the agent coming to him while he is concerned for the corporation, and in the course of the very transaction which is the subject of the suit, or so near before it that the agent must be presumed to recollect it,"—we conclude that, notwithstanding that the principal business which was being transacted between Bourne and Upson, in October, 1886, was the business of the Hotchkiss & Upson Company with the bank, and that the consideration of Hotchkiss' business with the bank was only incidentally brought forward, yet that it was so connected with the business in hand, and about which their interview took place, that the information then gathered by Upson was such as he was likely to have remembered during the period which ensued, and while Hotchkiss was appropriating the funds of the company; and that his knowledge ought to be imputed to the company. We cannot help feeling conscious that there may be an incongruity in a discussion leading to the establishment of this proposition with what seems to us the obvious purpose of the Connecticut statute, for the reason that, as before stated, it seems doubtful to us whether the statute has any application to a liability incurred in the way

in which that of Hotchkiss was; but we have followed the main lines adopted by counsel in the argument, assuming that the statute applies not only to express obligations, but also to implied liabilities resulting from tort, and are unable, upon any view of the case, to reach a different conclusion from that reached in the court below, sustaining the lien of the bank. The result is that the decree of the court below should be affirmed.